THOMAS HODGINS *vs.* THE MINNEAPOLIS, ST. PAUL AND SAULT
STE. MARIE RAILROAD COMPANY.

Opinion filed July 7th, 1893.

**Stock Killing Cases—Prima Facie Case—Negligence—Evidence.**

> Where an action is brought against a railroad company for the negligent kill-
> ing of a domestic animal, the plaintiff can, if he sees fit to do so, make out a
> *prima facie* case without showing actual negligence, by proving the value of
> the animal and the fact that it was killed by defendant's train of cars; but in
> such case, if the defendant, to overcome the statutory presumption of negligence
> arising from the killing, shows conclusively by undisputed evidence that the
> train in question was at the time of the accident in good repair and condition,
> and was equipped with the best modern appliances and improvements in use,
> and was operated skillfully and with due care, then, and in such case, the sta-
> tutory presumption of negligence arising from the killing is rebutted and entirely
> overcome; and where in such case, at the close of the testimony, defendant
> requested the trial court to direct a verdict for the defendant, and the court
> refused to do so, *held*, that such refusal was reversible error.

Appeal from District Court, Dickey County; *Lauder*, J.

Action by Thomas Hodgins against the Minneapolis, St. Paul
& Sault Ste. Marie Railroad Company for the killing of plaintiff's
horse. Judgment for plaintiff. Defendant appeals.

Reversed.

*A. D. Flemington* and *A. H. Bright*, for appellant.
*W. H. Rowe* and *Jas. M. Austin*, for respondent.

WALLIN, J. This action is brought to recover damages for the
killing of plaintiff's horse. The horse was killed in the evening,
at about 8:45 o'clock, on May 24th, 1890, by being run over by
defendant's locomotive. The accident occurred on a bridge at a
crossing of the Maple river, a short distance east of Boynton
station, in Dickey County. When struck by the locomotive, the
hind legs of the horse had slipped through the ties of the bridge,
so that the animal could not extricate them, and the horse was
partly on the railroad track and partly off the track and on the
bridge. The animals head was facing the west, and the locomo-
tive and train were going east. The train, besides the locomotive

and tender, consisted of two coaches, viz: a passenger car and a sleeper. Plaintiff, without proving actual negligence, made out a *prima facie* case, under the statute, by showing the killing of the horse by being run over by the defendant's locomotive, and the value of the animal. To rebut the presumption of negligence raised by the statute from the mere fact of killing, the defendant introduced as witnesses the men who had charge of the train in question, viz: the engineer, firemen, and conductor. The engineer testified, in substance, that he had been an engineer nine years, and in defendant's employ six years, and that there were no demerit marks against him as an engineer; that the train in question was a special train drawn by a locomotive then newly repaired, and in good condition, and was equipped with all the appliances in use at the time and all the modern improvements, and that there were air brakes on the engine, tender, and coaches. After leaving the station, at 8:35 P. M., the train ran for some miles at the rate of about twenty miles an hour until it came upon a rough piece of road, and, while running over that, the rate was about fifteen miles an hour, to a point on the road distant about one-half mile from the bridge in question, and from there the speed was quickened to about twenty miles an hour, until the horse was seen by the engineer and fireman. "Q. How about the lookout? A. I had my lookout all the time. Just before I got to the rough place, I got to the window, and was looking out of the window. Q. Go on now, and state further. A. When we got down very near the bridge, I saw an object, right side, as I supposed was the number board. As I got very near to it, it moved. By the Court: Q. You supposed it was what? A. I supposed it was the number plate of the bridge. It was a white plate, with figures on it. White board, about that wide. * * * A. As I got very near the bridge, I saw the object move, and I discovered it was a horse; raised his head up, and threw one leg over the rail. Q. Where was he lying? A. He was lying between the guard rail of the bridge and the rail on which the engine runs, outside of the track. Just as he made a lunge, he threw one leg over the

rail, which cut off one hoof. He threw his head out, and the engine trucks, and pilot pushed him along. Q. When you saw this motion, what did you do? A. Did all possible to stop. Q. What was that? A. Put the air on, and made a——to stop. I reversed my engine on sand, putting her on the back motion; made what is called an 'immergency stop.' · Q. What effect would that have on the brakes and wheels? A. It would have a great——. Q. Would it stop the wheels? A. It would stop the wheels. It would help to stop the train speed. The motion of the wheels going ahead, the reverse of the engine would have the effect to drive the wheels opposite to the head motion. Q. And it would have· a tendency to shove the train back? A. Yes sir. Q. After you saw this horse, was there anything else you could have done to have stopped this train? A. No sir. Q. You made what you call an 'emergency stop?' A. Yes sir. Q. I will ask you, until you saw the horse raise his head, and throw its leg over the rail, was the track clear? A. The track was clear. Q. Clear across the bridge? A. Yes sir. Q. Now, if I understand you, you mean that no part of the horse's body,—that no part of the horse was lying between the rails? A. No. sir. Q. How far is the outer rail from the guard rail, as you call it? A. The guard rail is put on the outside of the bridge tie, so as to hold them from slipping endways. It is a wooden guard rail. Q. How far from the rail? A. I think it is calculated to be three feet. Q. When you saw this horse, what did you see in the way of danger to yourself that it amounted to? A. I knew right off that there was great danger there. If the horse had been between the rails, I should have been almost tempted to jump off. Q. And you say that the train and the people on it were in danger of their lives? A. Yes sir. Q. What was the color of the horse? A. White. Q. What was the color of the number board? A. White. Q. What was the firemen doing? A. Keeping a lookout. . Q. Do you know when he recognized this object? A. At the same time that I did. He had just about half the words out of his mouth, saying 'Ho,' when I saw it. Q. How many feet were you

from the horse when you applied the brakes? A. I should judge between six and seven hundred feet. I would say between six and seven rods. Q. Or how many feet. A. About 114-15 feet. Q. State whether or not this is a long or short distance to stop a train in of that kind. A. A short distance to stop a train of that kind. Q. About what rate were you running at the time you saw the horse? A. Twenty miles an hour. Q. About what rate when you struck? A. About five. Q. You stopped, did you? A. Yes sir.. Q. Was there any one there when you stopped? A. No one there when I stopped." The witness further testified that the train reached the bridge about 8:45 P M., and that it was dusk, but not dark, at the time; that the lights on the train were lighted at the last station, Boynton, some three miles distant; and that the headlight is not much of a light until darkness comes. "Q At that time of day, how far could you see along the track? A. Not over one hundred and fifty feet. Q. Could you stop a train of three coaches with the latest improved air brakes in going the length of the train? A. Yes sir."

The testimony of the conductor, so far as it bears on the points made in the assignments of error, corroborates that of the engineer, but the appellant claims that there is a material conflict in the testimony of the fireman and engineer as to where the train was with reference to the position of the horse when the horse was discovered by the engineer and fireman. It will be necessary to consider this feature of the fireman's testimony, which is as follows: "Q. Where were you, and what were you doing, on the evening of May 24th or 25th, 1890, the time of this accident? A. I was firing with Mr. Furtny [the engineer] on a special." Speaking of a point about a half a mile from the bridge, the witness was asked: "Q. From this time on until the engine struck the horse, what were you doing? A. Sitting on the seat. Q. Where was that? A. Left hand side of the engine. Q. What were you doing? A. Looking out of the window. Q. Were you constantly looking along the track? A. Yes sir. Q. How far was this from the bridge? A. About a half a mile. Q. During that time, did

you have to put any fire in the fire box? A. No, sir. Q. When did you first discover the horse? A. When he raised his head. Q. Up to that time, was the track itself clear? A. Yes sir. Q. Well, what was done by the engineer? A. He blew the brake alarm, and reversed his engine, and gave her sand." The witness fully corroborated the engineer as to the appliances on the train and the good condition of the engine. He then testified as follows: "Q. About how far do you think you were from the horse when these brakes were put on? A. I should judge about five or six hundred feet,—somewhere along there. Q. Now, in stating the distance the train was from the horse, when I asked this question, I have reference to the distance that your locomotive was west of the horse when the brakes were applied. How far was that? A. I couldn't just tell. Q. How far do you think? A. Somewhere along between five and four hundred feet. That is what I thought it was. Q. How many times the length of the train do you think it was? A. It was not over the length of the train. Q. Is that train nearly four hundred and fifty feet long? A. I do not think I understand the question. Q. I want to know how far it was from where the engine was, when the brakes were put on the engine, to the horse at the time. I asked you how many lengths of the train? A. It was not the length of the train. About the length of two coaches is what it was. By the Court: Q. How long is a coach? How many feet is a coach? Is it 200 feet long? A. I do not believe they are. Q. How many feet do you think the engine was from the horse when the brakes were applied? A. I couldn't say. Q. Of course you didn't measure it. Give an estimate. A. Well I did. Q. About four hundred feet? A. About four hundred feet. Q. Daylight or dusk? A. Dusk,—quite dusk. Q. Which one saw the horse first? A. That I couldn't say. Both saw it about the same time. I hadn't the words out of my mouth when he put the brakes on." The testimony showed that the grade approaching the bridge was 30 or 35 feet to the mile; also that a passenger coach is 60 feet in length. As to the stop, the conductor testified: "It was a very

quick stop; almost threw me off my feet. When they applied the brakes first, I fell forward, and it almost threw me off my balance.

A motion was made at the close of the case to direct a verdict for the defendant, which was denied, and in this court the ruling is assigned as error. We think the ruling was error. There was but a single point arising on the evidence. The court charged the jury as follows: "Now, gentlemen, there is just one question to determine in this case: Did those in charge of that train use ordinary care to prevent the injury after they had discovered the horse? They had no right to anticipate, or, rather, there was no obligation upon them to anticipate, that a horse or a person or anything else was upon the track. But, when they observed that a person or an animal is upon the track, it is their duty to exercise reasonable care to prevent injury to the horse or person, as the case may be." The charge was entirely correct, and laid down the well established rule and the rule applied by this court in *Bostwick* v. *Railroad Co.*, 2 N. D. 440, 51 N. W. Rep. 781. But we think the case, as presented by the testimony, is one in which there was a complete failure of proof upon the vital point of negligence, and consequently a case where the responsibility of making a decisive ruling belonged to the court, and should not have been devolved upon the jury. In making out a *prima facie* case, no testimony tending to show negligence was introduced by the plaintiff. The fact of the killing, however, made out a case of legal or constructive negligence under the statute, which declares: "The killing or damaging of any horse, cattle or other stock by the cars or locomotive along said railroad or branches, shall be *prima facie* evidence of carelessness and negligence of said corporation." Comp. Laws, § 5501. But this court held in the case of *Smith* v. *Railroad Co.*, 53 N. W. Rep. 173, that negligence which is constructive and legal, as contradistinguished from actual negligence, may be overcome by proof of the exercise of due care on the part of the railway company, and that whether or not such constructive negligence has been overcome by testimony is always a question of law for

the court, and not a question to submit to a jury. The defendant offered testimony to rebut and overcome the technical case of presumptive or legal negligence which the statute creates for plaintiff's benefit. In our opinion, the testimony was ample for this purpose, and went further, and demonstrated that the defendant was guilty of no negligence whatever in the premises. The testimony of the engineer, conductor, and fireman is not contradicted as to any material fact having reference to the degree of care used by the engineer and fireman in keeping a lookout, or in their strenuous efforts to avoid a collision after the peril to the horse and the train were discovered. Counsel for the respondent points to the discrepancy in the testimony of the fireman as to the distance of the horse from the engine at the time the air brakes were applied to stop the train. True, the fireman's ideas of distance between the engine and horse at that time, when expressed in feet, were confusing, and apparently conflicting with the engineer's testimony upon the point. But it is clear that the conflict was apparent, and not real. The fireman said and reiterated, in substance, that the horse was not the length of the train away from the engine when the brakes were applied, and that the distance was about the length of two coaches. In this he agreed substantially with the engineer, and, as we have said, there is no evidence in the case tending to show that the distance was either greater or less than that testified to by both the trainmen. Negligence is a fact, and where, as in this case, it constitutes the gist of the action, it must be made out affirmatively by the plaintiff. In the case at bar we find no proof whatever of actual negligence, and hence we are of the opinion that the court erred in refusing to direct a verdict for the defendant. A new trial will be directed. All concur.