R. S. BROOKINGS, Respondent, v. NORTHERN PACIFIC RAILWAY COMPANY, a Corporation, Appellant.

(180 N. W. 972.)

**Trial — instruction in action for killing of live stock held erroneous, assuming and singling out facts.**

In an action to recover of a railway company the value of a certain stallion killed at a crossing by one of the railway company's train, the fireman on a

train which went over the place where the stallion was killed, at or about the time he was killed, testified that the train on which he was such fireman struck a horse at that time and place, that he kept a lookout on the side of the track where the horse went upon the track; that the horse was not visible from where the engineer was seated keeping a lookout; that the engineer had died before the action was commenced. The plaintiff testified that the stallion went out of the pasture where he was kept between 2 o'clock P. M., and dark on November 9, 1912. That plaintiff went down to the crossing in the evening of November 9, 1912, but saw nothing of the stallion; that he went there again in the morning of November 10, 1912, and saw blood, hair, and portions of the entrails on the west end of the planks in the crossing, and that from there to a distance some 150–200 feet west of the crossing, where the mangled body of the stallion lay, there were marks showing that the stallion had been dragged by the train. There was no evidence, and no contention, that any other horse had been killed or injured at that particular time and place.

It is *held* that the trial court erred in instructing the jury:

1. That, even though they found that the defendant was not negligent in the operation of the train that struck the horse concerning which the fireman testified, they might find that the horse had been killed by some other train, concerning which defendant had offered no explanation.

**Railroads — instruction on lookout erroneous.**

2. That it was the particular duty of the engineer to keep a lookout for live stock.

**Trial — instruction to find full value shown held erroneous.**

3. That in event they found for the plaintiff, they must return a verdict for the full amount demanded by the plaintiff.

Opinion filed December 28, 1920.

From a judgment of the District Court of Stark County, *Lembke, J.*, defendant appeals.

Reversed and remanded for a new trial.

*W. F. Burnett* and *Young, Conmy, & Young,* for appellant.

In a case of this kind negligence proximately causing the loss must be shown. And where the killing is explained, plaintiff's case gets no support in the statutory presumption. Corbett v. G. N. R. Co. 19 N. D. 456, 125 N. W. 1054; Stoeber v. Soo (N. D.) 168 N. W. 562.

Proximate cause was not mentioned, and the jury simply found for the plaintiff on general principles. Under the holdings of this court the judgment should not be permitted to stand. Stoeber v. Soo R. Co.

supra; Anderson v. Soo (N. D.) 123 N. W. 28; Corbett v. G. N. R. Co., 28 N. D. 136; Duncau v. G. N. R. Co. 17 N. D. 610, 118 N. W. 826.

Defendant's employees, in operating its train, were not required to keep a lookout for trespassing stock. Bostwick v. R. Co. 2 N. D. 450, 51 N. W. 781; Hodgins v. R. Co. 3 N. D. 389, 56 N. W. 139; O'Leary v. Elevator Co. 7 N. D. 554, 41 L.R.A. 677, 75 N. W. 919; Wright v. M. St. P. & S. S. M. R. Co. 12 N. D. 163.

*S. E. Ellsworth,* for respondent.

"The killing or damaging of any horses, cattle, or other stock by the cars or locomotive along a railroad shall be prima facie evidence of carelessness and negligence on the part of the corporation." Comp. Laws 1913, § 4644.

"Generally the corporation operating a railway train and its employees possess the only information relating to negligence in operating the train, and this is why the burden is taken from the plaintiff, after proving the ownership and the killing, and placed upon the defendant." Corbett v. Great Northern R. Co. 19 N. D. 450, 125 N. W. 1054.

"The questions of negligence and contributory negligence are, where there is any material conflict in the testimony, questions of fact for the jury, rather than the court, to pass on." Corbett v. Great Northern R. Co. 29 N. D. 136, 148 N. W. 4.

"The duty of a railway company and its employees in case of stock trespassing upon its right of way is to exercise ordinary care not to injure it after it is discovered to be in a place of danger." McDonell v. Soo Line, 17 N. D. 606, 118 N. W. 819.

CHRISTIANSON, Ch. J. This is an action to recover damages for the loss of a certain stallion. In his complaint, the plaintiff alleges: That the defendant at all times mentioned in the complaint operated a line of railway through and across the county of Stark; that on November 9, 1912, the plaintiff was the owner and in full possession and control of a pure-blooded Percheron stallion, Prince Albert, registered No. 65,485, age about three years, and of the value of $2,000.

"That on the 9th day of November, A. D., 1912, while said stallion, Prince Albert, belonging to plaintiff as aforesaid, was rightfully and properly upon a public crossing over the railroad track of said defendant

47 N. D.—8.

and upon grounds included in a public highway, near said station of Richardton, county and state aforesaid, the agents and employees of defendant, operating a train upon said railway, approached said crossing at a high rate of speed without blowing the whistle or ringing the bell upon the engine of said train, or giving any of the signals required by law; and, knowing that said stallion was upon said crossing and in a position of peril from said approaching train, negligently, carelessly, and wilfully caused said train to run upon, against, and over said stallion, thereby injuring and wounding him so that shortly thereafter he died. That by reason of the facts aforesaid, and by negligent and wilful act of the servants, agents, and employees of said defendant in operating said train upon said tracks as aforesaid, without fault on his part, plaintiff has sustained damage and injury in the sum of $2,000." The answer denied generally the allegations of the complaint; and denied specifically that the stallion was of the value alleged in the complaint. The answer further denied that the stallion was injured by reason of the negligence of the defendant or its servants, and alleged the fact to be that the stallion was injured because of plaintiff's own negligence. The case was tried to a jury, verdict was returned in favor of the plaintiff for the full amount demanded in the complaint. Judgment was entered pursuant to the verdict, and defendant has appealed from such judgment.

Plaintiff offered evidence showing that he owned the stallion in controversy, and that he kept him at his ranch, some 2½ miles east of Richardton, in Stark county in this state; that the buildings on plaintiff's ranch, and a pasture adjacent thereto consisting of about 250 acres, lay on the north side of the defendant's line of railway; that such pasture lay in two sections; that the plaintiff had placed a gate where the fence running along the south side of such pasture intersected the section line, said gate being about a quarter of a mile directly north of the crossing at which the stallion was killed. Plaintiff testified that about 2:00 o'clock in the afternoon on November 9, 1912, he went to Richardton; that at the time he left, he observed that the stallion was in the pasture. In going to Richardton, the plaintiff went through the gate, which he says that he closed after passing through it. According to his testimony he returned "about dark." When asked to tell the time, he says, "He supposed [he returned home] between 5 and 6

o'clock." On his return he found the gate open, and, on arriving at the barn, he found only "part of the bunch of horses that the stallion was running with there." He thereupon went down to the crossing but found no horses there. He found some of the horses at a point between the crossing and the stable and drove those horses back toward the barn. He says that there was no snow on the ground; that it was not stormy, but that he thinks it was a little cloudy.

The following questions and answers are quoted from his direct examination.

Q. Did you go over the crossing to the south?

A. Yes, I went over to the crossing; I don't know as I went over the crossing.

Q. Did you find him anywhere?

A. I didn't see any evidence of him at all.

Q. Did you make such search as you could in the condition as to light?

A. Yes, sir. I didn't search very much because I didn't see the horse or the body of it at the crossing. I didn't suppose he was there.

Q. You looked about did you, looked about as long as you could?

A. I looked about the crossing. I didn't find the horse. I didn't look very much because I thought perhaps I was mistaken; that the horse was still maybe at home, and I went back to the stable.

Q. When you went back was he there?

A. No, sir.

Q. You took the other horses back with you?

A. Yes, sir, what I found.

Plaintiff further testified that he went to the crossing in question the next morning and saw "blood, hair, entrails, and everything else on the crossing and west of the crossing;" that there was blood upon the planks of the crossing; that those marks extended from a point on, and about 5 or 6 feet from the west end of the crossing until a considerable distance (about 150–200 feet) west of the crossing, where he found the dead body of the stallion; that at that time the section crew of the defendant was engaged in digging a hole in the ground in which to bury the body. Plaintiff's testimony further shows that east of the crossing at which the animal was killed, the railway tracks extend in a straight line for a

distance of about 3,200 feet; that beyond that point there is a slight curve toward the north for a distance of about 630 feet.

The defendant's witness, Hunke, testified that he was a fireman on defendant's train No. 5; that this train passed over the crossing in question, about midnight, on the night that plaintiff's stallion was killed; that the engineer in charge of the train is now dead; that the train hit a horse on the crossing in question, on that particular night; that as the train approached the crossing, he (Hunke) was on the bench keeping a lookout ahead; that the headlight was in good order and focused directly on the track ahead, but that the light would illuminate so as to make objects visible for a distance of about 100 feet on each side of the track; that as they approached the crossing, they were traveling at between 40 and 50 miles an hour; that he was seated so that he could and did keep a lookout on the south side of the track; that shortly before reaching the crossing some horses moved onto the track; that the train was then only a short distance away, and that it was impossible to stop the train after seeing the horses; that the engineer could not have seen the horses as they came on to the track, from where he was seated,—he being seated on the north side of the cab; that the train hit one of the horses; that this was evidenced by the rumbling of the wheels passing over the body of the horse, as well as by the stench which arose from the entrails and blood of the horse, coming in contact with the hot pipes or the front of the engine; that the bell was not rung, but that the whistle was blown for the crossing.

Plaintiff also introduced evidence that at the time of the accident the defendant operated four west-bound passenger trains, No. 3, which passed through Richardton about 1:30 in the afternoon; No. 5, which passed through there about midnight; No. 1, which passed through there about 1:30 A. M.; and No. 7, which passed through there at about 5:15 P. M.; that there also was a fast freight which went through there during the night, and that usually there were other west-bound freights during the night.

On this appeal defendant asserts that the plaintiff has failed to establish actionable negligence on the part of the defendant. While the case is a close one, we are not prepared to hold as a matter of law that the defendant overcame the statutory presumption of negligence (Comp.

Laws 1913, § 4644) raised by the fact that the horse was killed by defendant's train.

The defendant next contends that the court erred in its instructions to the jury. This contention, we believe, is well founded and must be sustained. The court instructed the jury in part thus: "Now, gentlemen of the jury, in this case we have the railroad coming in here and denying that they are liable. Then, the railroad comes in here and sets up an explanation with reference to one train only, and that is No. 7. Now, under the evidence of this case there are two trains that have passed this crossing between 5 o'clock and midnight the same afternoon and night. There is no evidence before you as to which train actually killed the horse; the horse that stood on the track was never identified by either the plaintiff or the defendant. The case stands this way. Supposing that the railroad company has established to your satisfaction a good and valid excuse for the killing of the horse by train No. 7—no, by train No. 5, that still would leave train No. 7, which arrives at Richardton at 5:15 P. M. uncontradicted. The question is left open there as to whether, perhaps, No. 5 may not have killed the horse; and it is up to you, jurymen, to find as to whether No. 5 has killed the horse or not from the evidence introduced in this case."

Later in his instructions the court said: "The court further instructs the jury that the law is that when a man proves that he owns live stock, and that it was killed upon the track of the railroad company, the law raises the presumption of negligence as against the railroad company, and when there is no showing to the contrary, no explanation on the part of the railroad company, then the man is entitled to recover. Gentlemen of the jury, this is applicable especially to train No. 7 . . . ."

Plaintiff contends that these instructions were correct under the rule announced by this court in Wright v. Minneapolis, St. P. & S. Ste. M. R. Co. 12 N. D. 159, 96 N. W. 324, and Anderson v. Minneapolis, St. P. & S. Ste. M. R. Co. 18 N. D. 462, 123 N. W. 281. In our opinion these cases readily distinguish themselves from the case at bar. In the Wright Case, the plaintiff introduced evidence showing that he owned two cows which had been killed by some train belonging to the Soo Railway Company. The defendant introduced evidence by the engineer of

the east-going passenger train which passed the place where the cattle were killed, on the morning of the day when they were killed. The court held that the testimony adduced by the defendant overcame the statutory presumption of negligence, and entitled the railway company to discharge as to this part of the plaintiff's claim. The testimony of the engineer and fireman related to the killing of one cow only, and the circumstances surrounding the death of the other cow were such as to indicate that that cow could not have been killed by that train, but must have been killed by a train moving in an opposite direction. Hence, there was no evidence whatever on the part of the defendant to overcome the statutory presumption of negligence as to the train which must have killed the second cow, and the court held that the verdict must be sustained as to the second cow for this reason. The portion of the opinion in the Wright Case dealing with this particular phase of the case is as follows: "Defendant, to overcome the prima facie case so made by its adversary, introduced as witnesses the engineer and fireman of the passenger train No. 108, which passed the place where these cattle were killed, going east on the morning of March 2, 1901. The testimony of these witnesses disclosed the killing of one only of the cows by this train, but under circumstances which, in the judgment of the trial court, fully overcame the statutory presumption of negligence, and entitled the defendant to a discharge as to this part of plaintiff's demand. Hodgins v. Minneapolis, St. P. & S. Ste. M. R. Co. 3 N. D. 382, 56 N. W. 139. The remittitur of $30, ordered by the trial court on the motion for a new trial, was for the value of this cow. As to the second cow included in the verdict, the evidence was such as to indicate that it was killed by a train going west, and therefore could not have been killed by passenger train No. 108, which killed the first one. This second cow was found dead near the track, about 2 rods west of the highway crossing. From a point about 25 rods east of this crossing there were footmarks for 7 or 8 rods, where 'the cow had made great leaps along the track;' also evidence indicating that she had been dragged west along the track 15 rods, leaving marks of blood, hair, horns, and hide on the track, to the point near which the broken and bruised body was found. This evidence is not reconcilable with the theory that the cow was killed by a train moving in an easterly direction. The jury must have found, as they had a right to do if they be-

lieve this evidence, that this cow was killed by some other train, and not by passenger train No. 108. Defendant offered no evidence to meet this condition of the proof. The statutory presumption of negligence from the killing of this cow by defendant's train was not overcome, and is sufficient to sustain the verdict for her value." 12 N. D. 162.

In the Anderson Case the defendant defended on the theory "that it did not injure the horse;" and in the supreme court it strenuously argued that there was no evidence "to warrant the jury in finding that the defendant inflicted the injury which resulted in the killing of the horse." 18 N. D. 465. The railway company in that case called as its witnesses the engineer and fireman of a certain train which passed over the place where the horse was injured. These witnesses testified that they discovered the injured horse lying in the ditch alongside the railroad track, and that they notified the station agent to send someone back to look after it. According to their testimony, however, the train which they operated did not injure the horse at all. Hence, we have this situation,—the horse was found under such circumstances that the only reasonable inference was that it had been injured by a passing train. The statute raised the presumption that the injury was occasioned by the negligence of the railroad company. If the testimony of the engineer and brakeman was true, the fact would still remain that the horse had been injured by a train belonging to the defendant in that case, and no evidence was adduced as to the such other trains. The court, also, held that the circumstances in the case were in direct conflict with the testimony of the trainmen, and that the jury might well have concluded that the train which they operated injured the horse. The court said: "The circumstances surrounding the injury to this horse are such that the jury may have found that they clearly indicated the injury of the animal by a train, and, while not equally as clear, we think strongly point toward the train in question, notwithstanding the testimony of the trainmen. The jury may well have found that the condition of the animal could be explained in no other manner, and that the testimony of the engineer and fireman was false."

In this case the situation is wholly different from that which existed in the Wright and Anderson Cases. In this case, the defendant does not deny that one of its trains killed the horse at the time and place where plaintiff's horse was found dead the next morning. And there

is not even the slightest intimation in the proof that more than one horse was killed at that time and place. The plaintiff,—who lives close to where the horse was killed,—according to his testimony, went down to the crossing between 7 and 8 o'clock on the morning of November 10th, and he then observed the blood, hair, and entrails on the west end of the crossing, and that from that place to the point where the mangled body of his stallion lay. Similar substances were found on the rails and ties. The same condition was testified to by one Mottershead, another witness called by the plaintiff, who was there and saw the horse being buried by the section crew on the morning of November 10th. The evidence will be searched in vain for even an intimation that any other horse was injured or killed at that particular crossing on that particular night. It will also be noted that the court, in its instructions, singles out train No. 7, as the one which might have killed the horse. According to the evidence offered by plaintiff this train was due to arrive at Richardton at 5:15 P. M. Hence, of course, it would pass the place where the stallion was killed some time earlier. It will be noted that the court says: "There is no evidence before you as to which train actually killed the horse." He further states that the horse which stood on the track has never been identified by either the plaintiff or the defendant. Of course, it goes without saying that the engineer and fireman of a train going at between 40 and 50 miles an hour cannot identify an animal with great particularity. If the instruction given in this case is correct, it would doubtless be correct in every case in which an animal is killed by a train, especially during the nighttime. It will also be noted that the court singled out the hours between 5:00 in the afternoon and midnight. According to plaintiff's testimony, he arrived at his home on his return from Richardson about dark, and according to his "supposition" the time was between 5:00 and 6:00 o'clock. After returning home he walked from his place down to the crossing. The instruction related to a matter which the defendant could not, under any reasonable view, have anticipated would be injected into the lawsuit. It not only assumed a state of facts for which there was no basis in the evidence, but, in instructing with reference to the statutory presumption of negligence, the trial court singled out train No. 7, and suggested to the jury that the statutory presumption was particularly applicable thereto. In this state a trial court has no right to comment

on facts, or express an opinion on the weight of the evidence. The inference to be drawn from the facts in evidence are for the jury. And it is a general rule that a misstatement of the evidence on a material fact to the prejudice of the party complaining is reversible error. In any view of the case, we are of the opinion that the giving of this instruction constituted reversible error.

The court also instructed the jury thus: "The court instructs the jury that it was the duty of the defendant's engineer to keep a lookout for stock upon its tracks, and to use ordinary care to avoid injury to stock after they had been discovered or after he might have discovered them by use of ordinary care and diligence." We also believe that this instruction was erroneous. In this case the engineer was dead. The action was not brought until between five and six years after the horse was killed, and in the meantime the engineer had died, so it was impossible for the defendant to produce his testimony. It will be noted that the court in its instruction places the duty to keep a lookout upon the *"engineer."* By the very nature of things there may be situations wherein it will be practically impossible for the engineer to keep a lookout on both sides. An examination of various reported cases disclosed that in many of them the fireman as well as the engineer was keeping a lookout at the time and place where an accident occurred. It is the duty of the defendant to keep a lookout at a crossing, but it is beyond the province of the court to say that this duty must be performed by any particular person.

The court, also, instructed the jury: "If you find from the evidence that the plaintiff is entitled to a verdict, he is entitled to the full amount, with interest from the date of killing." (Later the court changed the instruction so as to make the allowance of interest discretionary, but permitted the rest of the instruction to stand as given.)

In our opinion, this instruction should not have been given. It is true defendant offered no evidence as to the value of the stallion. Plaintiff, however, had the burden of showing its value. To establish such value he introduced the testimony of himself and two other witnesses, Mottershead and Davis.

On this phase of the case, plaintiff testified on his direct examination thus:

Q. Now, Mr. Brookings, from your knowledge as you have stated

it of the qualities of breeding of this stallion, your knowledge of the market value of horses of that class in this locality, the fact that you were the owner of this horse and of his sire and dam, can you state the value of the animal on the 9th day of November, 1912?

A. I think I could.

He further testified that the horse at that time was of the value of at least $2,000. The witness Mottershead testified that the value of the horse was *"about* $2,000."

The witness Davis testified thus:

Q. What was his value?

A. Oh, I think around $2,000.

Q. About $2,000?

A. Yes, sir.

We are of the opinion that under this evidence the question of value should have been submitted to the jury, and that it was error for the trial court to instruct that, in event they found for the plaintiff, they must fix the value of the horse at the full amount demanded in the complaint, *viz.;* $2,000. See Chamberlayne, Ev. §§ 2172 *et seq.;* Shuman v. Rund, 35 N. D. 384, 160 N. W. 507.

It follows from what has been said that the judgment must be reversed and the cause remanded for a new trial. We find it unnecessary to consider the other errors assigned, as it is not likely that they will arise upon another trial.

Reversed and remanded for a new trial.

BRONSON, ROBINSON, and BIRDZELL, JJ., concur.

GRACE, J. (specially concurring). I concur in the reversal of the judgment and in the remanding of the cause for a new trial.

Under the evidence in this case, the value of the horse was exclusively a question of fact for the jury. The instruction given, to the effect that if the jury found from the evidence that plaintiff is entitled to a verdict, that he is entitled to the full amount, is clearly erroneous. It was an invasion, by the court, of the province of the jury. The full amount referred to in the instruction was the value of the stallion, as alleged in the complaint.